UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Case No: 1:07-cr-72 |
| ) | |
| v. ) | |
| ) | |
| CHARLES L. FOSTER, ) | Chief District Judge Curtis L. Collier |
| ) | |
| Defendant. ) | |

**MEMORANDUM**

Before the Court is the report and recommendation ("R&R") issued by United States Magistrate Judge William B. Mitchell Carter (Court File No. 38) regarding Defendant's motion to suppress evidence. Defendant Charles L. Foster ("Defendant") has filed objections to the R&R (Court File No. 39). For the following reasons, the Court will **ACCEPT and ADOPT** the R&R of the magistrate judge.

**I.    FACTS AND PROCEDURAL BACKGROUND**

The motion to suppress concerns a search warrant issued by a state magistrate to search 224 Gliden Street, Athens, Tennessee ("Defendant's Residence").

In the summer of 2006 Agent Sam McNelley of the Tennessee 10th Judicial Drug Taskforce received information implicating Defendant in the distribution of crack cocaine. In January of 2007, law enforcement officials received several tips suggesting Defendant was involved in crack cocaine distribution. Specifically, one confidential source informed Agent McNelley and Detective Scottie Webb he had purchased crack cocaine from Defendant in the

past and believed he could do so again. On January 11, 2007, a known drug dealer informed Agent Eric Allman that he had met Defendant and believed he could purchase crack cocaine from Defendant.

The heart of the affidavit in support of the search warrant are three alleged controlled purchases of crack cocaine by a confidential informant known only as CS2. These purchases were from Defendant through an intermediary known only as "Dealer." Dealer told CS2 he could sell CS2 crack cocaine, but they would have to go to Athens, Tennessee in order to retrieve the crack cocaine.

On January 29, Dealer drove CS2 to a doublewide trailer in Athens to retrieve the crack cocaine. Agent McNelley followed the car until they arrived at Athens, but discontinued surveillance when they arrived in the city. Therefore Agent McNelley did not actually see the final destination for this controlled purchase.

The next day, Agent McNelly and Detective Marty Kyle of the Sweetwater Police Department met with CS2, and had CS2 arrange a second controlled purchase from Dealer. Dealer told CS2 they would have to return to Athens in order to retrieve more crack cocaine. This time, Agent McNelly and Detective Kyle followed CS2 and Dealer all the way from where they had met to Defendant's Residence. This was the same residence CS2 and Dealer drove to on the previous day. According to CS2, when they first arrived at Defendant's Residence, Defendant was not there so they went to a gas station and later returned to the residence. Dealer then went into the residence and returned a few minutes later with the crack cocaine.

Shortly before Agent McNelly completed the affidavit for the search of Defendant's Residence, CS2 and Dealer concluded a third controlled purchase. Once again, Dealer and CS2

drove to Athens. Once there, Dealer entered Defendant's Residence, and appeared to walk out with the crack cocaine.

The operative facts contained within the four corners of the affidavit and search warrant for Defendant's Residence in Athens, Tennessee are set out below. (Court File No. 32, Ex. 2 at 14).

> (4.) In the summer of 2006, your Affiant began receiving information from law enforcement officers and confidential sources that Charles L. Foster was involved in the distribution of cocaine in Athens, McMinn County, Tennessee. Your Affiant is aware that Charles L. Foster has convictions for two (2) counts of Possession of Cocaine for Resale, three (3) counts of Aggravated Burglary, two (2) counts of Theft, and Attempted 2nd Degree Murder.
>
> (5.) In January, 2007, your Affiant and Detective Scottie Webb with the Athens Police Department met with a confidential source (CSI), who advised your affiant that in the past, he/she has purchased crack cocaine from Charles Foster, and that he/she could purchase from him again.
>
> (6.) On January 11, 2007, Agent Eric Allman with the 10th Judicial District Drug Task Force spoke with a known drug dealer in Athens, TN, who told Agent Allman that he/she had met Charles Foster and believed he/she could purchase crack cocaine from Charles Foster.
>
> (7.) CS2 is a confidential informant who desires to remain anonymous and whose name your affiant has disclosed to you, the reviewing magistrate. [sic] Who has worked for the Monroe County Sheriff's Department, the Madisonville Police Department, the Sweetwater Police Department, and the 10th Judicial District Drug Task Force. He/she has provided information regarding narcotics trafficking and narcotics dealers to law enforcement officers at least thirty (30) times. The information provided by CS2 has been verified by law enforcement as true and accurate. CS2 has made approximately twenty (20) controlled purchases of narcotics from drug dealers in the 10th Judicial District under the guidance of law enforcement. These buys have led to criminal convictions against several different drug dealers in the 10th Judicial District.
>
> On January 29, 2007, CS2 contacted Detective Marty Kyle from the Sweetwater Police Department regarding a possible purchase of crack cocaine he/she could make from a known drug dealer in Sweetwater, TN, hereinafter referred to as Dealer. Dealer had told CS2 that they would have to drive to Athens, TN, to get the crack cocaine. Detective Kyle met with the CS2, and gave him marked confidential funds with which to purchase the crack cocaine. CS2 then met with

-3-

Dealer, and rode with him to Athens, TN. Detective Kyle followed CS2 to the meeting location between CS2 and Dealer. Det. Kyle then followed CS2 and Dealer to Athens, TN. When they arrived in the city, Det. Kyle discontinued any further surveillance. He met back with CS2 in Sweetwater a short time later. CS2 told Detective Kyle that dealer had taken CS2 to a house in Athens, TN. CS2 described the house as a double-wide trailer on the right side of the road at the end of a dead-end road. He described two (2) vehicles in the front yard of the trailer as a white Land Rover and a burgundy Chevelle, both of which are known by your affiant to be driven by Charles Foster.

(8.) On January 30, 2007, your Affiant and Det. Kyle met with CS2 regarding another purchase of crack cocaine from Dealer. CS2 made a controlled call to Dealer in an attempt to purchase crack cocaine. Dealer indicated they would have to return to Athens to pick up the crack cocaine. Your Affiant gave CS2 marked confidential funds for the purchase and searched CS2 and his/her vehicle for contraband with negative results. CS2 was fitted with an audio transmitting device which would allow your Affiant to monitor and record the conversation between CS2 and Dealer. This transmitting device malfunctioned after CS2 and Dealer first met, and no recording was made. Your Affiant and Det. Kyle followed CS2 to the meeting location between him/her and Dealer. CS2 and Dealer then drove together to 224 Gliden St., Athens, TN. This home is known by your Affiant to belong to Charles Foster. This knowledge is based on arrest records, and personal observations of law enforcement. Your affiant has also verified that Charles L. Foster is the owner of a white Land Rover. CS2 verified that this was the same home he/she and Dealer had gone to the day before to get crack cocaine. CS2 later told your Affiant that when they initially arrived at the home, Charles Foster was not there. Dealer and CS2 went to a gas station nearby, and then returned to the home a few minutes later. While waited in the car, Dealer went into the home and returned approximately seven (7) minutes later. Dealer then turned over the crack cocaine to CS2. Your Affiant and other law enforcement officers followed CS2 and Dealer back to Sweetwater where Dealer dropped CS2 off. CS2 then met back with your Affiant at a debriefing location. CS2 released approximately one gram of crack cocaine to your Affiant. The agents searched CS2 's person and vehicle and found no controlled substances. Law enforcement officers followed Dealer's vehicle to and from Athens, and were able to corroborate CS2 's information regarding each location to which they traveled.

(9.) Within the last 72 hours, Det. Kyle again met with CS2 in Sweetwater, TN. Det. Kyle gave CS2 marked confidential funds for the purchase and searched CS2 and his/her vehicle for contraband with negative results. CS2 was fitted with a digital recording device which would record the conversation between CS2 and Dealer. Det. Kyle then followed CS2 to the meeting location between CS2 and Dealer. CS2 got in Dealer's car and rode with him to Athens. Once again, they went to 224 Gliden St., Athens, TN; the known residence of Charles L. Foster.

> While CS2 waited in the car, Dealer went into the home and returned approximately ten (10) minutes later. Dealer then turned over the crack cocaine to CS2. Your Affiant and other law enforcement officers followed CS2 and Dealer back to Sweetwater where Dealer dropped CS2 off. CS2 then met back with your Affiant at a debriefing location. CS2 released approximately one gram of crack cocaine to your Affiant. The agents searched CS2 's person and vehicle and found no controlled substances. Law enforcement officers followed Dealer's vehicle to and from Athens, and were able to corroborate CS2 's information regarding each location to which they traveled. Detective Kyle later listened to the audio recording and verified the information provided by CS2.
>
> (10.) Based on his training and experience, your Affiant knows that drug traffickers, in addition to their residences, often utilize outbuilding, garages, property, curtilage and vehicles to secret controlled substances, paraphernalia, and records of drug transactions. Your affiant requests that any outbuildings, garages, barns, property, curtilage and vehicles present be included in the search of the premises herein described.

(Court File No. 32-2 pp, 10-13). The state magistrate judge approved the warrant on February 8, 2007 (Court File No. 32, Ex. 1).

## II. STANDARD OF REVIEW

This Court must conduct a *de novo* review of those portions of the magistrate's report and recommendation to which objection is made and may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. 28 U.S.C. § 636(b)(1)(C).

## III. DEFENDANT'S OBJECTIONS

Defendant raises two essential objections to the validity of the warrant.

First, Defendant argues the earlier tips are neither explicit nor detailed, and therefore cannot support the magistrate judge's conclusion that "Agent McNelley had explicit and detailed information concerning drug sales or drug possession on the premises of Defendant's Residence within the very recent past." (Court File No. 39 at 3). As to the controlled purchases, Defendant

argues CS2 never actually entered Defendant's Residence, never observed Defendant distribute the drugs, and never saw Defendant at the residence from where the drugs were allegedly obtained (*id*. at 4). Therefore, Defendant argues the magistrate judge erred because CS2 neither observed any criminal conduct taking place within Defendant's Residence nor observed Defendant committing any criminal acts.

Second, Defendant argues, the failure of the Affiant to advise the issuing state magistrate judge of two stops at a gas station prior to the stops at Defendant's Residence "so undermines the existence of probable cause otherwise set forth in the warrant as to render it invalid." (*Id*. at 8). Essentially, Defendant argues this failure calls into question the professionalism and credibility of the Affiant (*id*. at 8-10). The existence of probable cause in the warrant depends on the inference that Defendant's Residence was somehow involved in the illicit activity because Dealer took CS2 to Defendant's Residence three times before handing over crack cocaine. Defendant argues that the omission of the stops Dealer and CS2 made prior to arriving at Defendant's Residence were material to the question of probable cause.

For unknown reasons the Court does not have a response from the United States to Defendant's objections.

## IV. DISCUSSION

The magistrate judge correctly set out the standard of review for both issues, so the Court sees no need to repeat it here.

### A. Existence of Probable Cause

Defendant first argues the insubstantial anonymous tips given in the beginning of the affidavit cannot be used to support probable cause (Court File No. 39 at 2). These rumors are

not mentioned in the magistrate judge's R&R so there is no necessity for the Court to address this issue.

Defendant's second argument relies on the fact CS2 never saw Defendant engaged in any drug transactions. Defendant's argument CS2 failed to observe any criminal activity by Defendant is misplaced for two reasons.

The issue before the Court is not whether probable cause existed to believe Defendant was engaged in drug trafficking. Rather the issue is whether Defendant's Residence was a place where the evidence of a crime may be found. As Defendant concedes in a different context, the warrant issued in this case is a search warrant and not an arrest warrant (Court File No. 39 at 7) (conceding omission of Defendant's name not fatal to validity of warrant). The question is not whether CS2 had information sufficient to establish probable cause Defendant was involved with criminal activity. Rather the question is whether CS2 had information sufficient to establish there was probable cause to believe Defendant's Residence was the locus of criminal activity and evidence of that activity could be found there.

In this case, CS2 informed law enforcement officers of three controlled purchases made from Dealer. CS2 had purchased crack cocaine from Dealer on three occasions. Invariably, each purchase was preceded by a trip to Defendant's Residence in Athens, Tennessee. Dealer had told CS2 he had to go to Athens, Tennessee to retrieve the crack cocaine (Court File No. 32, Ex. 2 at 11). Before the final two purchases, law enforcement agents had searched CS2 and his vehicle to confirm CS2 had no crack cocaine with him before he met with Dealer (*id*. at 12). The final purchase was also recorded, and this recording confirmed CS2's account of events (*id*.). For the last two purchases, the officers followed CS2 and Dealer, and were able to confirm their final destination in Athens was in fact Defendant's Residence (*id*. at 12).

In sum, the officers knew from their own observation that CS2 had no drugs on his person or in his car before meeting Dealer. The officers knew CS2 and Dealer drove to a residence at Athens, Tennessee, which Dealer had identified to CS2 as the source of his drugs. The officers have a recording which confirms CS2's account of the last of these transactions. The officers knew after all these trips CS2 had procured crack cocaine. For the last two purchases the inescapable conclusion is CS2 procured crack cocaine from Dealer. Nearly as certainly, there seems to be little doubt Dealer in turn obtained the crack cocaine during the trip at some point. Where the Dealer uniformly left a house in a location he had identified as his source of drugs and immediately handed over crack cocaine a reasonable person would conclude that evidence of a crime could be found at that residence.

As the magistrate judge noted, the affidavit included a paragraph listing the successful prosecutions CS2 had participated and CS2's general reliability in the past:

> Agent McNelley notes that CS2 worked and provided information to at least four different law enforcement agencies. Further, he had done so on at least thirty (30) occasions, and his information had been confirmed or verified as being true and accurate. Additionally, CS2 had made approximately twenty (20) controlled purchases of narcotics for law enforcement agents which ultimately led to the arrest and convictions of several drug dealers. The informant's credentials for reliability and truthfulness are therefore substantial.

(Court File No. 38 at 7-8).

In any event, the officers were able to corroborate CS2's account of events through following the car to the general location and the specific destination on different events. The officers confirmed a drug deal had in fact taken place because they searched CS2 prior to two of the controlled purchases and therefore they CS2 had procured crack cocaine. And the officers corroborated CS2's account of the events of the final controlled purchase through audio recording. An accusation may be sufficiently corroborated through confirming its accuracy in

regard to its own details. *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983) (holding even the corroboration of innocent activity sufficient to establish probable cause of an anonymous tip that gave no basis for the tipsters source of knowledge). Here, the officers were able to corroborate illicit activity occurred at Defendant's Residence on at least one occasion. Defendant does not contest Dealer distributed crack cocaine to CS2 immediately after leaving Defendant's Residence. Thus the Court finds CS2's information was amply corroborated, and in any event the affidavit provided CS2 was a reliable informant.

The only remaining *Gates* factor is the basis of the informant's knowledge. *Gates*, 462 U.S. at 230-32. From the affidavit it is clear the affiant's knowledge was based on the account of someone who was able to observe the events first hand.

### B.     Omission of Stops at Gas Station

Defendant's argument the affidavit omitted material facts concerns a stop that Dealer and CS2 made at a gas station on each trip en route from Sweetwater, Tennessee to Athens, Tennessee on January 30 and February 7, 2007. Specifically, the parties have stipulated that on both January 30, 2007 and February 7, 2007, while traveling together in the same car from Sweetwater to Athens, CS2 and Dealer stopped at a convenience store to buy gas. CS2 gave money for the gas to Dealer who went inside with the money to pay for the gas. Law enforcement officers observed both of these stops, but they were not included in the affidavit.

Defendant argues "it might be reasonable to assume that Dealer obtained the drugs from someone at [Defendant's] residence, it is also just as reasonable to assume that Dealer obtained the drugs from someone at the gas station." (Court File No. 39 at 8). However, even if correct, this argument is unpersuasive. Probable cause "does not demand any showing that such a belief be . . . more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983). The affiant

merely must show there is probable cause to believe evidence of a crime may be found in the place to be searched. *Id.*

Defendant's argument is not compelling for two reasons. First, the omitted stops at the gas stations were in Sweetwater rather than Athens, which Dealer had identified as the source of his drugs (Court File No. 32 at 13). Second, each of the stops was at a different gas station (*id.*). The Government provides an affidavit in support of these assertions (Court File No. 32 Ex. 1), and Defendant does not appear to contradict them, either in his present objection or before the magistrate judge. Therefore, if the Government had included these incidents in the affidavit then it undoubtedly would have included the reasons that diminished the possibility Dealer procured the drugs at the gas stations.

Defendant also argues because this omission is relevant it shows the affiant failed to act as a reasonable police officer would and therefore casts doubt on the affiant's professionalism. He also argues the Court should hold the agent to a higher standard "in which he discloses all relevant information to the issuing magistrate." (Court File No. 39 at 10). Defendant also cites the affidavit of Wayne Smith who states "it would be very unusual and extremely rare for a dealer [to take] his customer to the location of his supplier for fear that to [do] so would result in his being cut out of the distribution ring." (*Id.*). Since the Court has concluded this omission was not material it does not call into question the officer's professionalism. The Court credits the affidavit of Wayne Smith even accepting his opinion it does not affect the issue of probable cause.

In the final analysis, the officers had evidence Dealer indicated his drug source was in Athens. Dealer took a customer to Athens, walked into Defendant's Residence, and returned handing the customer crack cocaine. Dealer did this three times. The officers were able to

confirm CS2's account of one of these transactions with a recording, and knew because of searches of CS2, he had actually obtained crack cocaine from Dealer. Notwithstanding the fact CS2 and Dealer stopped at two different gas stations on their way out of Sweetwater; a reasonable person would be justified in believing evidence of a crime would likely be found at Defendant's Residence.

V. **CONCLUSION**

For the foregoing reasons the Court will **ACCEPT and ADOPT** the magistrate judge's R&R (Court File No. 38). The Court will therefore **DENY** Defendant's motion to suppress and Defendant's supplement to that motion (Court File No. 17). This ruling renders Defendant's motion to Produce Supporting Documentation as to "CS2" moot (Court File No. 22). The Court will therefore **DENY** that motion as moot.

An Order shall enter.

**/s/**
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**